* * * * * * * * * * * *Page 2 
Upon review of the competent evidence of record, with reference to the errors assigned, and finding no good grounds to receive further evidence, or to rehear the parties or their representatives, the Full Commission, upon reconsideration of the evidence, affirms the Opinion and Award of the Deputy Commissioner, with modifications, and enters the following Opinion and Award.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which the parties entered into in their Pre-trial Agreement and at the hearing as:
 STIPULATIONS
1. The North Carolina Industrial Commission has jurisdiction of the parties and of the subject matter of these proceedings. The parties are properly before the North Carolina Industrial Commission.
2. The parties are correctly designated, and there is no question as to the mis-joinder or the non-joinder of any party.
3. An employment relationship existed between the parties at all times relevant to these proceedings.
4. Insurance Company of the State of Pennsylvania (hereinafter referred to as "Defendant-Carrier") provided workers' compensation insurance coverage at all times relevant to these proceedings, with Claims Management, Inc. acting as the administrator.
5. The parties were subject to and bound by the North Carolina Workers' Compensation Act at all times relevant to these proceedings, with Wal-Mart Stores, Inc. (hereinafter referred to as "Defendant-Employer") employing the requisite number of employees to be bound under the provisions of the North Carolina Workers' Compensation Act. *Page 3 
6. Plaintiff sustained a compensable injury by accident arising out of and in the course and in the scope of her employment with Defendant-Employer on June 14, 1997.
7. Plaintiff's average weekly wage at the time of the June 14, 1997 work injury was $204.61, yielding a compensation rate of $136.41.
8. The parties stipulated to the following documents being admitted into evidence as stipulated exhibits:
 a. Stipulated Exhibit one (1) — Pre-trial Agreement;
 b. Stipulated Exhibit two (2) — Plaintiff's medical records;
 c. Stipulated Exhibit three (3) — North Carolina Industrial Commission forms and filings;
 d. Stipulated Exhibit four (4) — Plaintiff's written discovery responses;
 e. Stipulated Exhibit five (5) — Plaintiff's personnel file.
 * * * * * * * * * * * ISSUES
The issues for determination are:
1. Whether Plaintiff is entitled to any additional temporary total disability compensation and medical care, and if so, whether Plaintiff's current symptoms and disability, if any, are causally related to her June 14, 1997 work injury?
 * * * * * * * * * * *
Based upon the competent and the credible evidence of record, as well as any reasonable inferences that may be drawn therefrom, the Full Commission makes the following:
 FINDINGS OF FACT *Page 4 
1. Plaintiff is 64 years old, with her date of birth being October 1, 1944. Plaintiff began working for Defendant-Employer in June 1996 as a sales clerk. This position required Plaintiff to work with a cash register and to work on the sales floor.
2. On June 14, 1997, Plaintiff was working for Defendant-Employer when a package containing two (2) 24 ounce cans of rug cleaner fell onto her left foot, with the major point of impact being behind her left great toe. Plaintiff testified that the cans fell from a height of approximately eight (8) feet. However, Defendant-Employer's personnel manager, Ms. Natalie Wilmark Clonch (no relation to Plaintiff) testified that it was not possible that the cans fell eight (8) feet, and that the cans may have fallen from a height of four and one-half (4 ½) to five (5) feet. Defendants accepted compensability only for Plaintiff's medical expenses related to her June 14, 1997 work injury.
3. Plaintiff first received medical treatment for her June 14, 1997 work injury on June 16, 1997 from Dr. Charles Phillip Essex, a family practitioner. Dr. Essex, who routinely examines Defendant-Employer's employees, diagnosed Plaintiff as having sustained a left foot contusion, for which he gave her an injection and took her out of work for a few days. However, Plaintiff had an allergic reaction to the injection, requiring her to remain out of work for approximately six (6) weeks, according to other medical records.
4. While Dr. Essex treated Plaintiff, he found that her reports of pain did not reconcile with the objective data. At his deposition, Dr. Essex initially testified that he did not observe symptoms in Plaintiff of reflex sympathetic dystrophy, also known a complex regional pain syndrome (hereinafter referred to as "RSD/CRPS"). However, Dr. Essex later clarified that he did not actually discuss RSD/CRPS with Plaintiff, as he had no results of any nerve conduction studies. Dr. Essex further explained that he was only vaguely familiar with RSD/CRPS and its associated symptoms.
5. On July 9, 1997, at the direction of Defendants, Dr. Byron Edward Dunaway, an orthopaedic surgeon, examined Plaintiff, obtained x-rays, and ultimately found that Plaintiff's reports of symptoms did not correspond to the objective evidence. Dr. Dunaway diagnosed Plaintiff as having sustained a bruise of her left great toe. Subsequent to this initial examination, Plaintiff returned to Dr. Dunaway on several dates, and consistently reported experiencing ongoing, severe pain. Dr. Dunaway ordered additional x-rays, and opined that Plaintiff's reports of pain were out of proportion for the extent of her injury. However, Dr. Dunaway did not conduct a bone scan, a diagnostic test often used to assist in detecting RSD/CRPS. On September 30, 1997, Dr. Dunaway released Plaintiff from his care to full, unrestricted work duty, opining that she reached maximum medical improvement, and assigning a zero (0) percent permanent partial disability rating.
6. Plaintiff testified that because Dr. Dunaway did not treat her in any manner that alleviated her symptoms, she sought treatment on her own from Dr. Walter J. Falardeau, III, a podiatrist. Plaintiff further testified that she attempted to contact a representative of Defendants in an effort to obtain additional medical treatment prior to seeking it on her own, but was unsuccessful. Dr. Falardeau first examined Plaintiff on January 22, 1998, and found that she was displaying persistent pain symptoms that were out of proportion with the magnitude of her June 14, 1997 work injury. Dr. Falardeau opined that this subjective-objective discrepancy was highly suggestive of RSD/CRPS. With this possible diagnosis, Dr. Falardeau referred Plaintiff for a bone scan and a vascular consultation. Although Plaintiff contends that Dr. Falardeau informed her *Page 5 
that she should not be working in any capacity, Dr. Falareau's medical records indicate that he recommended light-duty work.
7. On March 10, 1998, Plaintiff underwent an independent medical examination, scheduled by Defendants and performed by Dr. Steven Samuel Hughes, an orthopaedic surgeon. Plaintiff testified that Dr. Hughes informed her that she had RSD/CRPS. Although Dr. Hughes's medical records do not reflect what Plaintiff contends, the records do indicate that Dr. Hughes was aware that other health care providers either suspected that she had RSD/CRPS, or diagnosed her as having RSD/CRPS. Dr. Hughes recommended a bone scan, as well as work hardening and desensitization therapy. Moreover, Dr. Hughes opined that Plaintiff could return to work at a sedentary level of work, with restrictions of no prolonged or repetitive weight-bearing on her left foot, as well as no running, pushing, pulling, or lifting greater than five (5) pounds. Further, Dr. Hughes opined that Plaintiff would reach maximum medical improvement approximately six (6) to eight (8) weeks following the completion of her work hardening and desensitization therapy. There is no evidence in the record indicating that Defendants ever authorized the work hardening and desensitization therapy.
8. On March 30, 1998, Dr. Thurmond Eric Siceloff examined Plaintiff upon the referral of Defendants. Dr. Siceloff documented Plaintiff's reports of ongoing, severe pain since her June 14, 1997 work injury, and attempted to treat her with injections. When Plaintiff's condition did not improve, Dr. Siceloff referred her to Dr. Walter Sherwood Davis, a physical medicine and pain management specialist.
9. Dr. Davis took Plaintiff out of work from June 22, 1998 until July 20, 1998, while he attempted to ascertain the nature of Plaintiff's complaints regarding her left foot. Over the course of Plaintiff's initial visits with Dr. Davis, he found no symptoms that he viewed to be *Page 6 
indicative of RSD/CRPS. According to Dr. Davis, signs of RSD/CRPS normally appear one (1) to six (6) months after an injury, such that any foot or leg pain reported by Plaintiff would probably not be related to her June 14, 1997 work injury. Dr. Davis opined that Plaintiff's reports of ongoing pain were perplexing, given the lack of objective findings, that there was no need for additional diagnostic testing such as a bone scan, and that Plaintiff's main problem with her job was her lack of endurance, a problem which he felt to be unrelated to her June 14, 1997 work injury. Additionally, Dr. Davis opined that Plaintiff reached maximum medical improvement as of August 11, 1998, and released Plaintiff to a gradually increasing workday, including four (4) hours a day for one (1) week, followed by six (6) hours a day for two (2) weeks, and then eight (8) hours a day thereafter, with no light-duty work restrictions.
10. On November 10, 2000, Dr. John Hodges, a podiatrist, examined Plaintiff, and found her symptoms were consistent with having RSD/CRPS in her left foot and leg. For this condition, Dr. Hodges recommended that Plaintiff undergo magnetic resonance imaging (MRI), and that her work activity be restricted to no lifting, bending, twisting, squatting, kneeling, or climbing. Additionally, Dr. Hodges gave Plaintiff a special boot for her left foot. Plaintiff testified that she informed Defendants of these recommendations, but that she never received a response from them.
11. On September 24, 2001, Dr. James Bayard Caress, a neurologist, examined Plaintiff. This examination took place upon the referral of Dr. Hodges. Plaintiff testified that Dr. Caress informed her that she had RSD/CRPS; however, Dr. Caress's medical records indicate differently. Dr. Caress ultimately opined that Plaintiff's symptoms and history were in no way suggestive of RSD/CRPS. *Page 7 
12. On December 20, 2002, Plaintiff returned to Dr. Falardeau. At that time, Dr. Falardeau opined that Plaintiff remained suspicious for having RSD/CRPS. Dr. Falardeau also repeated his 1998 recommendation that Plaintiff undergo a bone scan in order to assist in determining whether she actually had RSD/CRPS.
13. On April 16, 2003, Dr. Kenneth Bloom, a podiatrist, examined Plaintiff at the direction of Defendants. During this examination, Dr. Bloom informed Plaintiff that he was not an expert in RSD/CRPS, and that he informed Defendants of that fact prior to the appointment. Additionally, Dr. Bloom indicated in his medical records that he could not administer spinal blocks as a treatment, should it be determined that Plaintiff had RSD/CRPS, and that she may benefit from such treatment.
14. On June 25, 2003, Plaintiff presented to Dr. Andrew Joseph Braunstein, who testified that Plaintiff's subjective reports of pain in her left foot were difficult to objectively validate. Dr. Braunstein further testified that during this appointment, Plaintiff continued to direct him away from the objective findings toward issues that were bothering her emotionally. Despite these difficulties, Dr. Braunstein opined that Plaintiff possibly had RSD/CRPS. Regarding this opinion, Dr. Braunstein agreed that physicians who examined Plaintiff immediately after her June 14, 1997 work injury, as well as those physicians who examined her over the next year, were in a better position to render opinions on the causal relationship between her symptoms and the work injury. Dr. Braunstein also deferred to the earlier examining physicians regarding Plaintiff's ability to work. Additionally, Dr. Braunstein testified that his diagnostic criteria require at least eight (8) objective findings to confirm a diagnosis of RSD/CRPS, but that he made at most two (2) objective findings with Plaintiff. *Page 8 
15. Plaintiff's medical records indicate that from January 11, 1999 through July 27, 2005, she presented to various physicians at Piedmont Healthcare, including Dr. Newman Maxville Lewis, for the management of various general medical complaints, including treatment of her left foot complaints. Dr. Lewis wrote Plaintiff out of work due to her left foot complaints on several occasions, including from August 18, 2004 through August 24, 2004, and from October 29, 2004 through December 11, 2004. On December 8, 2004, Dr. Lewis directed that Plaintiff could return to work on December 11, 2004 at 28 hours per week, with "some restrictions," though Dr. Lewis did not elaborate on what those specific restrictions were.
16. On October 5, 2006, Plaintiff presented to Dr. Thomas Kern Carlton, III for an independent medical evaluation. Based upon this initial examination of Plaintiff, Dr. Carlton did not think that Plaintiff met the criteria for RSD/CRPS. However, Dr. Carlton did agree with previous recommendations that Plaintiff undergo a bone scan in order to assist with determining whether Plaintiff had RSD/CRPS.
17. On October 12, 2006, Plaintiff underwent a three (3) phase bone scan, which revealed more blood flow to the middle part of the left foot when compared to the right foot. Dr. Carlton next saw Plaintiff on November 15, 2006 in order to review the results of the bone scan with her. At that time, Dr. Carlton opined that the bone scan findings were not necessarily specific for a definitive diagnosis of RSD/CRPS, and so he ordered an MRI of the left foot.
18. On April 17, 2007, Plaintiff underwent an MRI of the left foot, which revealed a ganglion along the medial aspect of the first left metatarsal, and degenerative changes in the first metatarsal below Plaintiff's great toe. On April 23, 2007, Dr. Carlton saw Plaintiff in order to review the results of the MRI of the left foot. Dr. Carlton noted that the abnormal findings of the MRI of the left foot did not correspond with the area showing increased blood flow in the middle *Page 9 
of the left foot on the bone scan, and that neither the findings on the MRI of the left foot nor the findings on the bone scan correlated to Plaintiff's complaints of pain in the entire leg. Dr. Carlton concluded that Plaintiff did not demonstrate any objective criteria supporting a diagnosis of RSD/CRPS, that Plaintiff was at maximum medical improvement with respect to her June 14, 1997 work injury, and assigned a five (5) percent permanent partial disability rating to her left foot, due to her persistent complaints of left foot pain. In addition, Dr. Carlton suggested that Plaintiff should consult a surgeon about obtaining nerve blocks in order to treat the ganglion, although Plaintiff refused this or any further treatment or medications.
19. At Dr. Carlton's deposition, he testified, based upon Plaintiff's history, his physical examinations of her, and review of the diagnostic studies he ordered, including the bone scan and MRI of the left foot, that Plaintiff did not meet the criteria for a diagnosis of RSD/CRPS. Dr. Carlton did, however, make a diagnosis of chronic pain syndrome, and agreed that if Plaintiff presented to him with findings of allodynia (pain due to a stimulus that normally does not provoke pain) and burning pain, rather than throbbing pain, as she did later with Dr. Poehling, he would agree that it would be more probable that she had RSD/CRPS. Finally, Dr. Carlton testified that he agreed with Plaintiff's permanent work restrictions of 28 hours per week of sedentary-type work, which he understood that she had been doing for several years.
20. On June 19, 2007, Plaintiff first presented to Dr. Gary George Poehling, and then went on to see Dr. Poehling again on October 8, 2007. Dr. Poehling is a board-certified orthopaedic surgeon, and recently retired after 19 years as chairman of the Department of Orthopaedics at Wake Forest University, Bowman Gray School of Medicine. During Dr. Poehling's over 40 years in the practice of medicine, he devoted a great deal of his time to the study and treatment of RSD/CRPS. In addition to treating hundreds of patients with RSD/CRPS, *Page 10 
Dr. Poehling and his colleagues published several papers concerning RSD/CRPS. Based upon Dr. Poehling's research and clinical experience in the area of RSD/CRPS, the Full Commission finds that he is a leading expert in the diagnosis and treatment of patients with RSD/CRPS, and gives his opinions greater weight.
21. Based upon Dr. Poehling's review of Plaintiff's medical records, including her relevant diagnostic studies, as well as upon his examination and treatment of Plaintiff, Dr. Poehling opined that Plaintiff suffered from RSD/CRPS. Particularly key to Dr. Poehling's diagnosis was the fact that Plaintiff described burning pain that was worse at night, as well as allodynia in her left foot, all of which limited her activity level in terms of both type and duration. Although Dr. Poehling agreed that the results of Plaintiff's bone scan were certainly consistent with a diagnosis of RSD/CRPS, he testified that positive bone scan findings were not absolutely necessary in reaching a diagnosis of RSD/CRPS, as this is a primarily clinical diagnosis characterized by a problem in the central nervous system, and not the site of the original injury or insult. Dr. Poehling went on to testify that due to the nature of RSD/CRPS being a central nervous system-generated disorder, patient-to-patient symptomatology and response to treatment is highly variable. Thus, diagnostic testing such as bone scans and MRI's may not necessarily catch all cases of RSD/CRPS. The common denominator in cases of RSD/CRPS is the spinal cord's inability to suppress pain receptors even years after an injury or insult that would normally resolve.
22. Dr. Poehling opined that Plaintiff was at maximum medical improvement as of October 8, 2007, and assigned a 15 percent permanent partial disability rating to her left lower extremity secondary to chronic pain due to her June 14, 1997 work injury. Dr. Poehling also opined that the work restrictions to which Plaintiff had been adhering over the past several years, *Page 11 
28 hours per week at the sedentary level, remained appropriate. Finally, Dr. Poehling testified that RSD/CRPS is a permanently disabling condition for which Plaintiff will need medication and treatment at varying degrees, given the natural ebb and flow of the symptoms accompanying this disorder.
23. Plaintiff testified that she has pain and swelling in her legs and feet that significantly limit her ability to work and participate in daily activities. Specifically, Plaintiff represented that she was unable to lift more than five (5) pounds, that she was unable to stoop down and grab low-positioned items unless sitting on a stool, and that she is unable to stand or walk for long periods of time. Further, Plaintiff testified that she is no longer able to work at her local flea market selling clothing since her June 14, 1997 work injury. The Full Commission finds the above testimony of Plaintiff to be credible.
24. Other witnesses, including Ms. Clonch, Defendant-Employer's personnel manager, contradicted Plaintiff's testimony regarding her physical condition and abilities. Ms. Clonch testified that Plaintiff's ankles appeared to her to be the same as when Plaintiff originally interviewed for her position with Defendant-Employer in 1996. Ms. Shelley Dean Dowdna, one of Defendant-Employer's assistant store managers, testified that she observed Plaintiff shopping at Defendant-Employer's store, and that while doing so, Plaintiff pushed a cart and showed no difficulty in picking up items. Ms. Dowdna further testified that in February 2005, she observed Plaintiff exiting a grocery store with a cart full of groceries, some located on the bottom rack, and that Plaintiff showed no difficulty bending or unloading the items on the bottom rack.
25. Defendants raised an issue regarding Plaintiff's attendance of several country music concerts, and whether such activity is contrary to Plaintiff's reports of symptoms. The Full Commission gives little weight to this evidence in relation to Plaintiff's disability. *Page 12 
26. The Full Commission gives greater weight to the opinions of Dr. Poehling, and finds, based upon the greater weight of the evidence, that Plaintiff developed RSD/CRPS as a direct result of her June 14, 1997 work injury. As a result of Plaintiff's RSD/CRPS, she is entitled to have Defendants pay for medical expenses incurred or to be incurred, for so long as such medical treatment may be required to effect a cure, to give relief, and/or to lessen her period of disability with respect to her RSD/CRPS.
27. Plaintiff is entitled to temporary total disability compensation for the periods of time in which Plaintiff's treating physicians took her completely out of work, including, but not limited to, the approximately six (6) weeks shortly after the June 14, 1997 work injury when Dr. Essex took her out of work due to the allergic reaction she had to an injection given by him; from June 22, 1998 through July 20, 1998, when Dr. Davis took her completely out of work, as well as from August 18, 2004 through August 24, 2004; and from October 29, 2004 through December 11, 2004, when Dr. Lewis took her completely out of work. Plaintiff is also entitled to temporary partial disability compensation for up to 300 weeks from her June 14, 1997 work injury, at varying rates for the periods of time after her work injury that she worked diminished hours. It appears from the available evidence of record that Plaintiff was only capable of working 28 to 35 hours per week after her injury.
28. In addition to the specific dates enumerated, above, setting forth when Plaintiff's treating physicians either wrote her completely out of work or limited the number of hours per day or week that she could work, there appear to be other references in the record to times in which Plaintiff was either out of work or on a limited work schedule due to her June 14, 1997 work injury, although no specific dates or hours worked are provided. Further, the Full Commission takes judicial notice of the Form 28 and the Form 28T, both signed on October 30, *Page 13 
2004. Based upon the conflicting information provided on these forms, the Full Commission cannot determine Plaintiff's period of disability and/or what, if any, compensation Defendants paid during these time periods.
29. Further, the Full Commission gives greater weight to the opinions of Dr. Poehling concerning Plaintiff's permanent partial disability rating, as well as Dr. Poehling's opinions concerning appropriate work restrictions for Plaintiff. Dr. Poehling opined, and the Full Commission so finds, that Plaintiff retains a 15 percent permanent partial disability rating to her left lower extremity secondary to chronic pain due to her June 14, 1997 work injury. In addition, Dr. Poehling opined that the work restrictions of 28 hours per week of work at the sedentary level are appropriate.
30. The Full Commission finds, based upon the greater weight of the evidence, that Plaintiff was able to work 40 hours per week, earning $5.55 at the time of her June 14, 1997 work injury. The parties stipulated that at the time of Plaintiff's June 14, 1997 work injury, her average weekly wage was $204.61. Shortly after and as a result of Plaintiff's June 14, 1997 work injury, she became temporarily and totally disabled for approximately six (6) weeks, thereby diminishing her wage-earning capacity, as she was never again capable of working 40 hours per week. Following Plaintiff's June 14, 1997 work injury, her actual earnings with Defendant-Employer were indicative of her wage-earning capacity.
31. Although a number of Plaintiff's treating physicians found her to be at maximum medical improvement on numerous earlier dates, the extent of Plaintiff's injury and disability could not be fully determined until she underwent the bone scan that almost all of her previous treating physicians had been suggesting for many years. Thus, the Full Commission finds, based upon the greater weight of the evidence, that Plaintiff reached maximum medical improvement on *Page 14 
October 8, 2007, the date on which Dr. Poehling, the first physician to actually diagnose her with RSD/CRPS, concluded that Plaintiff reached maximum medical improvement.
 * * * * * * * * * * *
Based upon the foregoing stipulations and upon the foregoing findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained a compensable injury by accident arising out of and in the course and in the scope of her employment with Defendant-Employer on June 14, 1997. N.C. Gen. Stat. § 97-2(6) (2007).
2. Plaintiff developed RSD/CRPS as a direct result of her June 14, 1997 work injury. Id.; Terry v. PPG Industries, Inc., 156 N.C. App. 512,577 S.E.2d 326 (2003), review denied by, 357 N.C. 256, 583 S.E.2d 290
(2003).
3. As a result of Plaintiff's June 14, 1997 work injury and resulting RSD/CRPS, she is entitled to have Defendants pay for medical expenses incurred or to be incurred, for so long as such medical treatment may be required to effect a cure, to give relief, and/or to lessen Plaintiff's period of disability with respect to her RSD/CRPS. N.C. Gen. Stat. §§ 97-2(19), 97-25 (2007).
4. As a result of Plaintiff's RSD/CRPS, she is entitled to temporary total disability compensation for the periods of time in which her treating physicians took her completely out of work, including, but not limited to, the approximately six (6) weeks shortly after the June 14, 1997 work injury when Dr. Essex took her out of work due to the allergic reaction she had to an injection given by him; from June 22, 1998 through July 20, 1998, when Dr. Davis took her completely out of work, as well as from August 18, 2004 through August 24, 2004; and from October 29, 2004 through December 11, 2004, when Dr. Lewis took her completely out of work. *Page 15 
Plaintiff is also entitled to temporary partial disability compensation for up to 300 weeks from her June 14, 1997 work injury, at varying rates for the periods of time after her work injury that she worked diminished hours. It appears from the available evidence of record that Plaintiff was only capable of working 28 to 35 hours per week after her injury. N.C. Gen. Stat. §§ 97-29, 97-30 (2007). Russell v. Lowes ProductDistribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993). In addition to the specific dates enumerated, above, setting forth when Plaintiff's treating physicians either wrote her completely out of work or limited the number of hours per day or week that she could work, there appear to be other references in the record to times in which Plaintiff was either out of work or on a limited work schedule due to her June 14, 1997 work injury, although no specific dates or hours worked are provided. The actual diminished hours Plaintiff worked after her June 14, 1997 work injury are indicative of her capacity to earn wages.
5. Plaintiff retains a 15 percent permanent partial disability rating to her left lower extremity secondary to chronic pain due to her June 14, 1997 work injury. N.C. Gen. Stat. § 97-31 (2007).
6. Plaintiff was able to work 40 hours per week and earned $5.55 at the time of her June 14, 1997 work injury. The parties stipulated that at the time of Plaintiff's June 14, 1997 work injury, her average weekly wage was $204.61. Shortly after and as a result of Plaintiff's June 14, 1997 work injury, she became temporarily and totally disabled for approximately six (6) weeks, thereby diminishing her wage-earning capacity, as she was never again capable of working 40 hours per week. Following Plaintiff's June 14, 1997 work injury, her actual earnings with Defendant-Employer were indicative of her wage-earning capacity.Russell v. Lowes Product Distribution, 108 N.C. App. 762, 425 S.E.2d 454
(1993). Plaintiff is entitled to temporary partial disability compensation based upon two-thirds (2/3) of the difference between her pre-injury *Page 16 
average weekly wage and the weekly wage she earned thereafter for a period not to exceed 300 weeks. Plaintiff did not reach maximum medical improvement during the 300-week period. Plaintiff's temporary partial disability benefits ended at 300 weeks. N.C. Gen. Stat. §§ 97-29, 97-30
(2007).
7. Although a number of Plaintiff's treating physicians found her to be at maximum medical improvement on numerous earlier dates, the extent of Plaintiff's injury and disability could not be fully determined until she underwent the bone scan that almost all of her previous treating physicians had been suggesting for many years, and received a diagnosis of RSD/CRPS. Thus, Plaintiff reached maximum medical improvement on October 8, 2007, the date on which Dr. Poehling, the first physician to actually diagnose her with RSD/CRPS, concluded that Plaintiff reached maximum medical improvement. At the time Plaintiff reached maximum medical improvement, the maximum 300-week time period for receiving temporary partial disability compensation under N.C. Gen. Stat. § 97-30
already expired, and was not an available election of benefits. N.C. Gen. Stat. § 97-30 (2007). Thus, Plaintiff is entitled to receive the 15 percent permanent partial disability rating assigned by Dr. Gary George Poehling to her left lower extremity secondary to chronic pain due to her June 14, 1997 work injury.
* * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission makes the following:
 AWARD
1. Defendants shall pay for all medical expenses incurred or to be incurred in the future by Plaintiff due to her June 14, 1997 work injury and resulting RSD/CRPS, including reimbursement to Plaintiff for out-of-pocket expenses. *Page 17 
2. Subject to a reasonable attorney's fee herein approved, Defendants shall pay temporary total disability compensation to Plaintiff for the periods of time in which her treating physicians took her completely out of work, including, but not limited to, the approximately six (6) weeks shortly after the June 14, 1997 work injury when Dr. Essex took her out of work due to the allergic reaction she had to an injection given by him; from June 22, 1998 through July 20, 1998, when Dr. Davis took her completely out of work, as well as from August 18, 2004 through August 24, 2004; and from October 29, 2004 through December 11, 2004, when Dr. Lewis took her completely out of work.
3. Also subject to a reasonable attorney's fee herein approved, Defendants shall pay temporary partial disability compensation at varying rates to Plaintiff, based upon two-thirds (2/3) of the difference between her pre-injury average weekly wage and the weekly wage she earned thereafter for a period not to exceed 300 weeks.
4. Also subject to a reasonable attorney's fee herein approved, Defendants shall pay permanent partial disability compensation to Plaintiff for the 15 percent permanent partial disability rating to her left lower extremity secondary to chronic pain due to her June 14, 1997 work injury.
5. A reasonable attorney's fee is hereby approved for Plaintiff's counsel from the sums due Plaintiff under paragraph two (2), paragraph three (3), and paragraph four (4), above. Such attorney's fee shall be deducted by Defendants from Plaintiff's compensation and paid directly to Plaintiff's counsel.
6. Defendants shall pay the costs of these proceedings.
 This the ___ day of December 2008. *Page 18 
 S/___________________
 BERNADINE S. BALLANCE
 COMMISSIONER
 CONCURRING: S/___________________ DANNY LEE McDONALD COMMISSIONER
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER *Page 1